```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                        EASTERN DIVISION
```

Hong Sup Kim, et al.,            :

       Plaintiffs,           :

  v.                             :         Case No. 2:14-cv-00591

Kee Hoon Lee,                    :         Magistrate Judge Kemp

       Defendant.            :

<u>OPINION AND ORDER</u>

    This diversity case, in which the parties consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. §636(c), was tried to the Court, sitting without a jury, on March 1, 2017.  The Court held closing arguments on March 2, 2017.  This Opinion and Order constitutes the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a)(1).

I. <u>The Facts</u>

    Somewhat surprisingly, after all of the testimony was taken, there are not many disputed facts.  These are the facts established by the testimony of Plaintiffs Pan Soo Kim ("Pastor Kim") and his son, Hong Sup Kim, and Defendant Kee Hoon Lee.  After summarizing the testimony, the Court will make numbered factual findings.

A. <u>The Trial Evidence</u>

    Mr. Lee, an Ohio resident, has a background in applied mathematics and nuclear engineering, but in 2004 or 2005 he purchased a Super 8 Motel in Columbus, Ohio, on a land contract.  The purchase was made through Eastern Eagle Corp., a subchapter S corporation.  Mr. Lee and his wife were the sole shareholders of that company.

    In 2006, Mr. Lee incorporated Eastern Eagle One Corp., another subchapter S corporation owned by him and his wife.  It

is not entirely clear why he did so, but eventually that company played a part in the events which led to this lawsuit.

In 2007, it appears that the Super 8 Motel was doing well. Mr. Lee told his pastor, Pastor Moo Soo Park, a Korean citizen who had a residence and a church in or near Los Angeles, of his success. Mr. Lee also attended a service or gathering of that church in September, 2007.

Another attendee of that gathering was Pastor Kim, who was a student of Pastor Park. Pastor Kim lives in Korea, but he had been coming to the United States twice a year to help out Pastor Park, and when he did so he stayed with Pastor Park at his residence. At one point, he was asked to meet with Pastor Park and Mr. Lee. During that meeting, Pastor Park asked Mr. Lee to tell him if there were any issues with Mr. Lee's hotel business that Pastor Park could pray about. That was the first time Pastor Kim and Mr. Lee met each other.

Later in 2007, something happened which led Pastor Kim to agree to send Mr. Lee $300,000.00. There are two versions of this story. According to Pastor Kim, Pastor Park told him that Mr. Lee was in need of money, and because Mr. Lee was doing good things for the Christian mission in America, Pastor Kim should help him out. Pastor Kim said that, as a student of Pastor Park's, he could not refuse such a request. He put together $300,000.00 from his own savings, money his son had saved, money from his wife, money from a bank loan, and money from either his daughter or from members of his congregation (or both), and wired the money either directly or indirectly to Mr. Lee. At least $100,000.00 was wired to Pastor Kim's son, Plaintiff Hong Sup Kim, who was living in Virginia at the time, and who then wired that $100,000.00 to Mr. Lee. Hong Sup Kim testified that he had been saving up money "in his father's pocket" and that some

amount of the $100,000.00 (perhaps $35,000.00 or $40,000.00) represented those savings.

Mr. Lee told a different story about how this all happened. He said that he learned from Pastor Park that Pastor Kim was interested in investing in an American motel.  Mr. Lee was working on the purchase of a second motel, a Howard Johnson's located near Cincinnati, and he offered to make Pastor Kim a "silent partner" in that venture.  According to Mr. Lee, Pastor Kim was insistent that his name not appear on any of the official documents relating to the hotel purchase and operation.  In February, 2008, Mr. Lee signed a franchise agreement with Howard Johnson's on behalf of Eastern Eagle One, and that company bought the hotel.  He and Pastor Kim each invested $300,000.00 in the venture.  Exhibit D9 has a breakdown of how that $600,000.00 was spent, and lists Pan Soo Kim and Ju Hee Lee, Mr. Lee's wife, as the two investors.  At some point, Mr. Lee furnished a copy of that document to Pastor Kim.

Both Pastor Kim and Mr. Lee testified about their understanding of what kind of deal had been struck.  According to Pastor Kim - who said that his understanding came almost entirely from conversations with Pastor Park - he would get his money back in a reasonably short time frame, perhaps in a year or two.  At some point in the near future, Mr. Lee would make a gift of the hotel to Pastor Park, who would pay off any outstanding bank loans and operate the property.  Then Pastor Park would settle up with everyone, which settlement would include repaying Pastor Kim.  Initially, Pastor Kim did not expect to receive any interest on the money (although that changed later).  Pastor Kim also testified that he had at least one conversation with Mr. Lee in which Mr. Lee confirmed that he would be giving the hotel to Pastor Park on some future date.

Mr. Lee, on the other hand, said that through direct discussions with Pastor Kim, the two made an arrangement to be 50-50 partners in the Howard Johnson's venture. This arrangement was not reflected in the ownership of Eastern Eagle One since, according to Mr. Lee, a foreign national may not be a shareholder of an S corporation. However, Mr. Lee intended to share the profits of the operation equally with Pastor Kim.

Unfortunately for all parties, things went downhill in a hurry. Right after he acquired the Howard Johnson motel, Mr. Lee was either sued or threatened with a lawsuit by a disability rights advocacy group which said that the motel was not in compliance with the Americans with Disabilities Act. Also, a fire department inspection revealed problems with the wiring for the air conditioning. Those two problems would have required several hundred thousand dollars to fix. Then, as is well known, the economy experienced a severe downturn beginning in September, 2008. The Super 8 Motel began to lose money, and Mr. Lee used funds from the Howard Johnson account to cover some of Super 8's losses, intending (he claimed) to repay it, but that never happened. Mr. Lee and his wife eventually filed for bankruptcy and lost both motels. He was never able to pay Pastor Kim any money.

There are a small handful of documents which provide some circumstantial evidence about what type of agreement the parties actually entered into. First, Exhibit D9, the closing statement for the Howard Johnson's purchase, was prepared by Mr. Lee very close in time to the money transfer. It describes the $300,000.00 received from Pastor Kim as "investment." Second, the tax returns for Mr. Lee and for Eastern Eagle One show that Mr. Lee claimed 100% of the revenue and expenses from the Howard Johnson's operation on his tax returns. There is no evidence that he provided Pastor Kim with any tax document reflecting that

Pastor Kim was sharing in the operation of that property (although counsel, in closing argument, asserted that the terms of the investment deal entitled Pastor Kim to 50% of any profit, but did not require him to account for operating revenue or permit him to take advantage of any tax losses).  Third, when Mr. Lee filed for bankruptcy, he did not list Pastor Kim or any other source of the $300,000.00 as a creditor.  There is no evidence that he advised anyone in connection with either the bankruptcy or a receivership which took over operation of the Howard Johnson motel that Pastor Kim had some type of legal or equitable interest in that property, however.

    Next, there are some emails from 2009 which deal with the subject of the downturn in the motels' operation.  The Court will provide a brief chronological summary of them and then discuss their significance.  They are all part of Plaintiffs' Exhibit C.

    First, on June 13, 2009, Mr. Lee emailed Pastor Kim (with the understanding that Pastor Kim would provide a copy to Pastor Park, who does not use email) to tell the two about problems with both motels.  At the end, he asked them to send him $100,000.00.  (They declined).  See Ex. C, pp. C-004 to C-006.

    Almost three months later, Pastor Kim emailed Mr. Lee.  Mr. Lee's response (Ex. C, pp. C-010 to C-012) states that there was a telephone conversation as well.  The key points made in that email are these.  First, Pastor Kim apparently told Mr. Lee that some of the $300,000.00 had been borrowed from a Korean bank, and that Pastor Kim was paying interest on the loan.  Mr. Lee replied that Pastor Kim should have known that "it is fundamentally wrong to invest in any business located in America with a loan obtained from Korea."  Second, Mr. Lee said that he wanted to "go over interest and principal payments which you are most interested in."  He commented that since Pastor Kim had not participated in the motel's operations, "it is most logical to believe that I

obtained a loan of $300,000 from a bank, named Reverend Pan-Soo Kim." He then agreed to pay yearly interest of 7% and to pay $10,000 immediately rather than the full one-year's interest of $21,000.00. He also promised to pay back the entire $300,000.00 once one of the two motels was sold.

The next email was sent on September 12, 2009 (Ex. C, pp. C-015 to C-016). The email repeats questions which had been posed to Mr. Lee in some form - perhaps in an email sent in response to the previous one- and those questions are repeated in Mr. Lee's response. One of the things Pastor Kim apparently expressed confusion over was Mr. Lee's "unilateral statement" that he considered the money sent by Pastor Kim to have been borrowed. Pastor Kim also rejected the offer of a $10,000.00 payment and demanded $100,000.00 immediately, which, as Mr. Lee explained, he was unable to pay. Pastor Kim also made this statement: "It is a shame to see that there is a discrepancy in our agreement in regards to the principal and interest. It was your suggestion at first." Mr. Lee replied that he would do his "best for responsibilities in regards to your investment of $300,000 here" and said that "I will definitely pay you back first if God helps to sell any one of my hotels before the date of your wish."

The final one of the Exhibit C emails was written on August 29, 2010. In it, Mr. Lee explained that he had been forced to give up both properties and that he had been advised to file bankruptcy. That email also referred to Pastor Kim's having "invested" in the Howard Johnson's project. (Ex. C, p. C-016).

The last item of circumstantial evidence is testimony from Mr. Lee that, after the Howard Johnson's venture got off the ground, Pastor Kim inquired about other possible motel investments. Mr. Lee consulted with real estate brokers in Columbus who were offering motels for sale and sent at least two emails to Pastor Kim giving him details of those properties. Mr.

Lee offered this testimony to bolster his claim that Pastor Kim had expressed an interest in investing in American motels. He identified the emails in question, but because they had not been translated into English and because they were identified as trial exhibits less than two weeks before the start of the trial, the Court did not admit them into evidence.

### B. Factual Findings

The Court makes these factual findings, keeping in mind that it is the Plaintiffs' burden to prove, by a preponderance of the evidence, each element of their claims. Each of the facts set forth below is based on the Court's determination that those facts are more likely true than not true.

1. In late 2007 or early 2008, Plaintiff Pan Soo Kim wired, or caused to be wired, a total of $300,000.00 to Defendant Kee H. Lee.

2. Most of that money belonged to Pan Soo Kim, either through his personal assets or through borrowing. Approximately $35,000 of it belonged to his son, Plaintiff Hong Sup Kim, and approximately $40,000 was Pan Soo Kim's wife's money. Some may have come from his daughter or from members of his congregation. The best determination the Court can make from the evidence is that Pan Soo Kim supplied $200,000 from personal or borrowed funds; Hong Sup Kim supplied $35,000 from personal funds held by his father; Pan Soo Kim's wife supplied $40,000; and the remaining $25,000 came from other sources.

3. By the time Pan Soo Kim made the decision to wire the money, Mr. Lee was already in negotiations to buy the Howard Johnson's motel.

4. The $300,000.00 was part of the money used to purchase the Howard Johnson's motel, as shown on Exhibit D9.

5. Any conversation which took place between Pan Soo Kim and Mr. Lee before the money was transferred did not include any

discussion of the fact that the money was to be a loan, nor did Pan Soo Kim, in any such conversation with Mr. Lee before the money was wired, say that he considered it to be a loan.

    6.  There is no written agreement with respect to any aspect of the transfer of funds.

    7.  There is no document dated prior to the transfer of the funds which mentions, in any way, what type of transaction the parties were entering into.

    8.  Hong Sup Kim had only one conversation with Mr. Lee before wiring him money, and that was to confirm that the money was being sent to the correct account number.

    9.  The post-transaction evidence discussed above is, at best, equally balanced in terms of demonstrating that the money was intended, at the time of transfer, to be either a loan or an investment.

    10.  Mr. Lee made statements which can be viewed, depending on when they were made and the context in which they were made, as supporting either proposition.  His promise to pay back the money with interest suggests that the transaction was a loan. His characterization, on the closing sheet, of the payment as an investment suggests the opposite.  In some of the same emails in which Mr. Lee offered repayment, he also made statements to the effect that the money was an investment, that he understood Pastor Kim was disappointed that there had been no profits, and that repayment would occur only on the sale of the property - all indicating some type of investment arrangement rather than a loan.

    11.  Although Mr. Lee did not allocate any share of the revenue or losses incurred by Eastern Eagle One to Pastor Kim, it is not clear that he believed he was required to do so by the terms of their understanding.

12. Pastor Kim and Hong Sup Kim were not repaid, at least out of any money generated by the Howard Johnson's operation (or, for that matter, the Super 8 Motel operation), because those operations ended up in either receivership or bankruptcy. Mr. Lee and his wife, who operated their businesses jointly, also lost a substantial amount of money from the Howard Johnson's venture.

## II. The Law

Just as the Court discussed the evidence and then made numbered findings of fact, it will discuss the law and then make numbered conclusions of law.

### A. Discussion of the Law

Pastor Kim and Hong Sup Kim alleged in their complaint four causes of action: two based on breach of contract (express or implied), one based on promissory estoppel, and one based on unjust enrichment. In its Opinion and Order ruling on motions for summary judgment (Doc. 37), the Court dismissed all of Hong Sup Kim's claims except unjust enrichment. Consequently, the Court's discussion is limited to whether Pastor Kim has proved the first three causes of action, and whether either Plaintiff has proved the fourth.

#### 1. Breach of Contract (Counts I and II)

There is nothing new about the concept that "[t]he meeting of the minds of parties upon its terms is necessary to the making of a contract, and this is so whether it be an express contract or an implied one ...." Columbus, H.V. & T. Ry. Co. v. Gaffney, 65 Ohio St. 104 (1901), syllabus, ¶1. "The contract is the concrete result of the meeting of the minds of the contracting parties." Richmond & A.R. Co. v. R.A. Patterson Tobacco Co., 169 U.S. 311, 314 (1898). Stated slightly differently, "[a]n essential element needed to form a contract is that the parties must have a distinct and common intention which is communicated

-9-

by each party to the other." McCarthy, Lebit, Crystal & Haimaan Co., L.P.A. v. First Union Mgt., Inc., 87 Ohio App.3d 613, 620 (Cuyahoga Co. App. 1993). These principles have not changed over time, and they are the starting point of any discussion about whether two people entered into a binding legal contract.

Generally, courts recognize three types of contracts: express, implied in fact, and implied in law. Legros v. Tarr, 44 Ohio St.3d 1, 6 (1989), citing Hummel v. Hummel, 133 Ohio St. 520, 525 (1938). To make an express contract, the parties must have actually spoken or written out the terms of the agreement and must then have accepted them. Id. By contrast, the existence of a contract implied in fact can be established by proof of circumstances which show that the parties actually reached a tacit (that is, unspoken or unwritten) understanding about the terms. Id. The third type of contract, which is a contract implied in law, is not actually a contract at all because it is not based on either direct or circumstantial evidence that the parties had a "meeting of the minds" on the terms of their arrangement. Rather, it is what is called a "quasi-contract" and is based upon a legal determination that someone has received a benefit that, for reasons arising out of equity, it is not just or fair for that person to keep. See Hummel, supra. Unjust enrichment is a species of quasi-contract, see Hummel, syllabus, ¶1; see also Hambleton v. R.G. Barry Corp., 12 Ohio St.3d 179, 183 (1984), so the Court will defer any discussion of that theory of recovery until it reaches the merits of the unjust enrichment claim made by both Plaintiffs, see Section C below.

The parties agree, and the evidence confirms, that there was no express written contract setting out an agreement between the parties, so the Court must determine whether there was either an

-10-

express oral contract or a contract to be implied from the surrounding circumstances.

        a.   <u>Was There an Oral Contract?</u>

    Answering the first question - was there an oral contract - is fairly easy.  It is clear that under Ohio law, "[t]he existence and the terms of an oral contract are issues for the trier of fact." <u>See, e.g.</u>, <u>Depompei v. Santabarbara</u>, 2015 WL 114716, *6 (Cuyahoga Co. App. Jan. 8, 2015).  The party asserting the existence of an oral contract - in this case, Pastor Kim - "bears the burden of persuading the trier of fact that [Mr. Lee] actually agreed to the oral contract...." <u>See Tubelite Co. v. Original Sign Studio, Inc.</u>, 176 Ohio App.3d 241, 247 (Franklin Co. 2008).  Although the "[t]erms of an oral contract may be determined from 'words, deeds, acts, and silence of the parties,'" <u>see Kostalnik v. Helper</u>, 96 Ohio St.3d 1, 3 (2002), quoting <u>Rutledge v. Hoffman</u>, 81 Ohio App. 85 (Butler Co. 1947), syllabus ¶1, there must still be some type of credible evidence presented that the parties came to a meeting of the minds on the contract's essential terms.  Here, there is no such evidence.

    The only statement which Pastor Kim attributes to Mr. Lee during the entire time period when Pastor Kim was getting the money together was Mr. Lee's confirmation that, on some future date, "the hotel" (and is not clear which of the two he meant) would be transferred to Pastor Park.  That statement, if made, is far too indefinite to be construed as an agreement that the money coming from Pastor Kim would be a loan.

    The fact that Pastor Kim and Mr. Lee did not have a direct conversation in which they agreed to a loan arrangement does not necessarily mean they did not have a contract.  Parties may, and often do, negotiate the terms of an oral contract exclusively through a third party.  In that situation, though, each party

-11-

must still agree to the same contractual terms even if they never speak directly to each other.

Here, Pastor Kim presented no evidence that Mr. Lee spoke with Pastor Park about this transaction apart from telling him that he needed $300,000.00.  Even if Pastor Kim expressly told Pastor Park that the money was to be a loan - and the Court does not recall him saying that - there is no evidence that Pastor Park passed that statement on to Mr. Lee or that Mr. Lee agreed to it.  In short, there is no credible evidence that Pastor Kim and Mr. Lee agreed, either between themselves or through Pastor Park, that the money constituted a loan.  That eliminates any possibility that there was an express oral contract.

### b.  Do the Facts Imply a Contract?

The Court will next consider whether the evidence presented by Pastor Kim shows that he and Mr. Lee, by their words, deeds, and actions, taken as a whole, entered into an implied contract. Under Ohio law, mutual assent to the essential elements of an implied-in-fact contract is shown not by an express offer and acceptance, but by the "surrounding circumstances, including the conduct and declarations of the parties."  Those circumstances must "make it inferable that the contract exists as a matter of tacit understanding."  See GEM Indus., Inc. v. Sun Trust Bank, 700 F.Supp.2d 915 (N.D. Ohio 2010), quoting Stepp v. Freeman, 119 Ohio App. 3d 68, 74 (Montgomery Co. 1997).

As discussed in this Court's Opinion and Order of May 17, 2016 (Doc. 37), in Stepp, a group of co-workers were participating in a lottery pool.  The group had a set number of members and process, and the plaintiff had been a member of the pool for five years.  Members would often purchase the lottery tickets for each other if one member of the group could not be located immediately to contribute.  The group eventually won a significant sum of money.  Because the plaintiff had not yet paid

-12-

for his share of the ticket, the other members of the pool argued that they did not owe his share of the lottery winnings. The appellate court, affirming the trial court's decision in favor of the plaintiff, held that the ongoing behavior of the parties was sufficient to demonstrate an implied-in-fact contract. Id.

This case is much different. In Stepp, there was a long-standing arrangement, and the parties conducted themselves in accordance with the terms of that arrangement. Here, there was no long-term understanding, and all of the conduct which Pastor Kim and Mr. Lee engaged in is consistent with any number of different financial arrangements.

As an example, the money changed hands between January 30 and February 12, 2008. Mr. Lee purchased the Howard Johnson's property seven days later and said on the closing statement that Pastor Kim's contribution to the purchase price was an investment. Pastor Kim did not object to that statement when he got it and, for some period of time, did not ask for repayment or for interest. His belief that a hotel would be given to Pastor Park at some point and that Pastor Park would then "settle" the matter is consistent with either a loan or an investment. Even if Mr. Lee confirmed that arrangement, that statement could be taken either way.

It is true that in September of 2009, more than eighteen months after receiving Pastor Kim's money, Mr. Lee acknowledged that Pastor Kim was now asking to be repaid with interest, and he described Pastor Kim as a "bank." It is also true that Pastor Kim questioned why that statement was made. These facts point in opposite directions. Other comments from the same time period suggest that Mr. Lee was still considering the money as an investment, and his conduct during the bankruptcy proceedings shows that he did not consider Pastor Kim to be a creditor. All of the parties' actions and subsequent words point to some type

of implied contract, but do not prove which type it was. Again, this is primarily a factual issue, and one on which Pastor Kim, as the plaintiff, has the burden of proof. He did not prove enough in the way of words or actions to make it more likely than not that he and Mr. Lee agreed on a loan. That is enough for the Court to dismiss his implied contract claim.

### 2. Count III- Promissory Estoppel

In the alternative, Pastor Kim argues that if neither the parties' words nor their actions are sufficient to prove that they had a meeting of the minds on the terms of a loan a agreement, he can still get his money back from Mr. Lee under the theory of promissory estoppel. "Promissory Estoppel is not an affirmative defense ... but allows a separate remedy for damages in the absence of an enforceable contract." Nachar v. PNC Bank, NA, 901 F.Supp.2d 1012, 1020 (N.D. Ohio 2012), citing Olympic Holding Co. LLC v. ACE Ltd., 122 Ohio St.3d 89 (2009). The elements of a claim of promissory estoppel are: "(1) a clear and unambiguous promise; (2) reliance on that promise; (3) reliance that was reasonable and foreseeable; and (4) damages caused by that reliance." JP Morgan Chase Bank, N.A. v. Horvath, 862 F.Supp.2d 744, 749 (S.D. Ohio 2012), citing Current Source, Inc. v. Elyria City Sch. Dist., 157 Ohio App.3d 765, 773,(Lorain Co. 2004). A promise is defined as "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." HAD Engs. v. Galloway, 192 Ohio App.3d 133, 144 (Pike Co. 2011), quoting Stull v. Combustion Engineering, Inc., 72 Ohio App.3d 553, 557 (1991) (internal quotations omitted). Some Ohio courts, interpreting the first paragraph of the syllabus of Kroll v. Close, 82 Ohio St. 190 (1910), have held that the party asserting the promissory estoppel claim bears the burden of proving by clear and convincing evidence all of the elements of

the claim. See, e.g., Book Dog Books, LLC v. Cengage Learning, Inc., 2013 WL 65465, *4 (S.D. Ohio Jan. 4, 2013), citing Swank v. Swank, 2011 WL 6966424, *13 (Richland Co. App. Dec. 30, 2011); In re Estate of Popov, 2003 WL 22017299, *5 (Lawrence Co. App. May 21, 2003). The syllabus in question actually says that "[t]he burden is upon the party who relies upon estoppel to prove clearly and unequivocally every fact essential to the estoppel." Whether this constitutes a heightened burden of proof is not material here because Pastor Kim has not proved this claim even by a preponderance of the evidence.

The analysis of this claim begins and ends with the first two elements, which require proof of "a clear and unambiguous promise" upon which the plaintiff relied. The type of promise necessary for this claim has been described as one "'which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does not induce such action or forbearance [and] is binding if injustice can be avoided only by enforcement of the promise.'" McCroskey v. State, 8 Ohio St.3d 29, 30 (1983), quoting Restatement of the Law, Contracts 2d (1973), Section 90. Necessarily, such a promise, in order to induce the other party to act on it, must have been made *before* the other party acted - in this case, before Pastor Kim sent Mr. Lee the money. This principle (which should be self-evident) is illustrated by this quotation from Konover Property Trust, Inc. v. WHE Associates, Inc., 142 Md.App. 476, 485 (2002):

> [The plaintiff] does not contend that [the defendant] actually promised [Plaintiff] that he would be compensated for these actions before [he] actually performed. Therefore, it cannot be said that [Plaintiff] relied on such promises or statements in performing his service....

-15-

Here, Pastor Kim did not prove that Mr. Lee made any promise to repay him his money at any particular time, in any particular manner, and under any particular circumstances, before Pastor Kim parted with the funds in question.  Pastor Kim may have been relying on Pastor Park's assurances that he would be repaid quickly, but there is no evidence that Mr. Lee authorized Pastor Park to make that promise on his behalf, and it is not the type of clear and unambiguous promise that can support a claim of promissory estoppel.  Even if the Court were to credit in full Pastor Kim's claim that Mr. Lee said the hotel would "soon" be transferred to Pastor Park, that statement is loaded with ambiguity.  Which hotel did he mean?  How was Pastor Park to settle up with anyone once he got the hotel?  Did the "settlement" which Pastor Park intended to make depend upon the hotel's either generating sufficient profit to pay Pastor Kim back, or having enough equity in it to allow that repayment once the hotel was sold?  None of these questions have clear answers.  In the absence of a definite promise made by Mr. Lee to Pastor Kim before he parted with his money that the money would be treated as a loan and would be repaid even if the hotel project was an economic failure - something the facts do not show - the Court simply cannot grant Pastor Kim relief on this theory.

### 3.  Count IV- Unjust Enrichment

The final claim asserted by both Pastor Kim and his son, Hong Sup Kim, is a claim based on the quasi-contractual theory of unjust enrichment.  Unjust enrichment occurs "when a party retains money or benefits which in justice and equity belong to another."  Cooper v. Smith, 155 Ohio App.3d 218 (Lawrence Co. 2003), quoting Liberty Mut. Ins. Co. v. Indus. Comm., 40 Ohio St.3d 109, 111 (1988) (internal quotations omitted). Unjust enrichment is not available as a remedy when an express contract covers the same subject matter. See, e.g., Hughes v. Oberholtzer,

-16-

162 Ohio St. 330 (1954).  "Under the doctrine of unjust enrichment (i.e., quantum meruit), a party may recover the reasonable value of services rendered in the absence of an express contract if denying such recovery would unjustly enrich the opposing party."  In re Estate of Popov, 2003 WL 22017299, *4 (Lawrence Co. May 21, 2003).

In order to recover on a claim of unjust enrichment, the party asserting the claim must demonstrate "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment."  Hambleton v. R.G. Barry Corp., 12 Ohio St.3d 179, 183 (1984); see also Myers v. Good, 2007 WL 2897753, *2 (Ross Co. App. Sept. 27, 2007) ("When a contract fails for a lack of 'meeting of the minds,' equity should be imposed to prevent an unjust enrichment... The proper remedy is quantum meruit, or the value of the benefit conferred on the other party").

There is no question that Pastor Kim (and any other person whose funds made up the $300,000.00 wired to Mr. Lee in early 2008) conferred a benefit on Mr. Lee, nor is there any question that he knew about the benefit.  The question here is whether it would be unjust, under all the circumstances, for him to retain the benefit (*i.e.* not repay Pastor Kim or Hong Sup Kim).  For the following reasons, the Court cannot reach that conclusion.

The Court does not believe, although there might be some evidence to support this conclusion, that the money was intended as an unconditional gift.  Cf. Camp St. Mary's Assn. of W. Ohio Conference of the United Methodist Church, Inc. v. Otterbein Homes, 176 Ohio App.3d 54, 71 (Auglaize Co. 2008)("an absolute gift bars a claim for unjust enrichment").  But the facts also do not support the claim that it was intended to be a loan and that Mr. Lee so understood it.  Mr. Lee testified credibly that he

-17-

considered the money to be an investment in the Howard Johnson's venture, and that had that venture proved profitable, he would have shared any profit equally with Pastor Kim.

It is true that, under some circumstances, money intended as an investment can be recovered under an unjust enrichment theory. See, e.g., Lozinsky v. Georgia Resources Management LLC, 734 F.Supp.2d 150 (D.D.C. 2010).  There, the court found that a company which had obtained money from the plaintiff as an equity investment had to pay it back because it had never, in the four years during which it had the money, provided the plaintiff with anything stating that he had become a part owner, and there was also no evidence that it used his money to further the company's business operations.  Because it took his money "under the guise of an investment, but provided ... nothing in return" the Court concluded that it would be "unjust for [the defendant] to retain [the] investment." Id. at 156.  See also Meadaa v. K.A.P. Enterprises, L.L.C., 756 F.3d 875, 884 (5th Cir. 2014)(ordering return of funds under an unjust enrichment theory when the recipient of the funds used the money to do improvements to its own property and to pay down a bank loan, but the investors "received nothing in return...").

Here, the evidence shows that Mr. Lee used the money received from Pastor Kim to purchase the Howard Johnson's property.  His closing statement constitutes an admission on his part that he (or his wife) and Pastor Kim were equal investors in the venture.  Had the hotel ever generated a profit, or had it been sold, Mr. Lee stood ready to share the proceeds equally with Pastor Kim.  Pastor Kim did not get "nothing" for his money; he acquired an interest in a motel.  While Mr. Lee did not give him shares of stock in Eastern Eagle One, that was not necessary since the arrangement could well have been, as counsel argued, a joint venture between that corporation and Pastor Kim, with each

-18-

having a one-half interest in the profits of the venture.  Under these circumstances, it would have been unjust for Mr. Lee to retain the money only if the motel had been profitable, or had it been sold at a profit, and Mr. Lee then refused to acknowledge Pastor Kim as a 50-50 partner.  Consequently, although this case shares some similarities with Lozinsky in that Mr. Lee did not provide much in the way of documentation to establish Pastor Kim's ownership interest, he did send him the closing statement, and afterwards acknowledged in writing Pastor Kim's ownership interest.  These circumstances are inconsistent with a finding that Mr. Lee unjustly retained the benefit of Pastor Kim's money, as is the fact that, ultimately, Mr. Lee also lost the entirety of his investment and was forced to file for bankruptcy and forfeit the property.  The Court therefore finds that the Plaintiffs have not proved the third element of their unjust enrichment claim.

B. Conclusions of Law

1. Plaintiffs had the burden of proof with respect to each element of their contract, promissory estoppel, and unjust enrichment claims.

2. Plaintiff Pan Soo Kim did not prove, by a preponderance of the evidence, that he and Defendant Lee entered into an oral agreement about the transfer of the funds; there was simply no meeting of the minds which preceded that transfer.

3. The circumstances surrounding the transfer and use of the money do not imply that the parties had a meeting of the minds to the effect that the money was a loan.

4. There is no evidence of a clear and unequivocal promise made by Mr. Lee, either directly or indirectly to Pastor Kim, and at or before the time that the money was transferred, to the effect that the money would be treated as a loan and would be

repaid regardless of the success of one or both of Mr. Lee's motel ventures.

     5.  It would not be unjust for Mr. Lee to retain the benefit of the funds transferred to him in light of his agreement to share any profits of the Howard Johnson's venture with Pastor Kim on a 50-50 basis and in light of the fact that the venture was unsuccessful, resulting in the loss not only of Pastor Kim's money but Mr. Lee's investment as well.

     6.  The Plaintiffs are not entitled to relief on any of their four claims.

### III. Order

Based on the Court's findings of fact and conclusions of law, the Court finds for the Defendant on all counts.  This case is dismissed with prejudice.  The Clerk is directed to enter judgment in favor of the Defendant.

                                    /s/ Terence P. Kemp
                                    United States Magistrate Judge